**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

Case No. 24-20239-CR-MIDDLEBROOKS/TORRES

UNITED STATES OF AMERICA

    *Plaintiff,*

v.

ROGER ALBERT TAFT GALLAGHER,

    *Defendant.*

_____/

**REPORT AND RECOMMENDATION
ON DEFENDANT'S MOTION TO SUPPRESS
STATEMENTS MADE DURING CUSTODIAL INTERROGATION**

This matter is before the Court on Defendant Robert Albert Taft Gallagher's motion to suppress.[1] [D.E. 22]. A motion hearing was held on October 22, 2024. Having carefully considered the record in this case and the governing law, Defendant's motion to suppress should be **GRANTED** for the reasons discussed below.

---

[1] This matter was referred to the undersigned Magistrate Judge for hearing and Report and Recommendation. [D.E. 29]. Unless otherwise noted, citations to "D.E." shall relate to Docket Entries filed in the above-styled case.

## I.    FACTUAL FINDINGS

On June 6, 2024, Defendant Robert Albert Taft Gallagher ("Gallagher") was indicted by a federal grand jury on one count of mail fraud, in violation of 18 U.S.C. § 1341, and one count of presenting a fictitious obligation, in violation of 18 U.S.C. § 514—both in connection with Gallagher's attempted purchase of a Porsche Cayenne in April of 2024.  [D.E. 26 at 1-3].  Then, on August 6, 2024, law enforcement greeted Gallagher—just off a redeye from Portland, Oregon—at Miami International Airport and, without incident, took him into custody.  [D.E. 26 at 3]; [D.E. 22 at 1].  The resulting custodial interrogation, which took place that morning, was recorded.[2]

The initial minutes of the interrogation appear routine—largely small talk, including whether Gallagher follows politics (1:07, Tape 1) and the origin story of Dr Pepper (4:35, Tape 1).  Gallagher's responses show clear engagement in the exchange. At one point while telling the story of how Dr Pepper came to be, the Agent pauses to find his next word ("While [the inventor] was in college, he developed the—the—the, uh—"), and Gallagher jumps in with, "formula," without missing a beat.  (5:03, Tape 1).  When the Agents begin to address the charges against Gallagher, he responds by asking what they mean by "fictitious obligation."  (5:54, Tape 1).  And in response, when prompted if he has "some idea" of why he is there, Gallagher indicates that he does.  (6:00, Tape 1).  Tape 1 cuts off just as the lead interrogating Agent is explaining,

---

[2] The Government provided the recorded interview to the Court as two video files. *See* [D.E. 26 at 3 n.2].  Accordingly, all references to the custodial interrogation will have general time stamps, as well as an indication of the file of origin.

broadbrush, how their investigation led to Gallagher's eventual arrest.  (8:56, Tape 1).

Tape 2 is the "meat and potatoes" of the interrogation.  Gallagher first indicates—pre-*Miranda*—that he will "try a little bit" to speak with the Agents at roughly six minutes and thirty-seven seconds into Tape 2.  Before that, however, Gallagher asks the lead Agent whether he should "tell [them his] side," as he has "never been in this position before," which leads to the following colloquy, wherein the Agent describes, among other things, "how[] attorneys work":

> Agent: So, that's where we're at.  So, do you want to believe our, uh—?
>
> Gallagher: I mean I could easily tell you my side.  I guess the question is: should I?  I've never been in this position before.  And—
>
> Agent: So, this is—this is what I tell people: I can't make that decision for you.  Um, we're all adults in this room.  Um, and, what I can tell you is that the lead investigator, um, who's been working with the U.S. Attorney on this, has an influence on what he can relay to them.  So, we all work our cases differently, but at the end of the day, um, for us this is just a job—it's not personal.  Um, and, what we always want to find out is to make sure that we don't put an innocent person in jail.  Um, and, we can only go based on the information and evidence that we have.  Um, I have sat here with my own cases.  Um, have allowed the person to give me their version, um, and—well, not their version but what actually happened on their side of the fence, and have come up, you know what?  The victim here wasn't being truthful to us.  Or didn't give us all the facts.  And I've gone to my prosecutor and said, "listen, we've got a problem here.  Um, we're gonna have to—."  Again, we can't tell the prosecutor what to do, but we can advise them, "hey, listen, in my opinion, we're gonna have a problem in court with this case.  So, it's a good idea that we drop the case."  So, ultimately that response to the question you asked me relies on the prosecutor based on our recommendation.  Um, so, uh, how do attorneys work?  Um, you'll bond out.  You'll look for an attorney.  Uh, hopefully, a good criminal attorney.  Um, that criminal attorney, uh, depending whether or not they have a relationship

> with the U.S. Attorney's office, um, will look at the evidence we have, and, at the end of the day, this is what I tell people: you could spend a lot of money on an attorney, um— but—they're—sometimes, the evidence is so overwhelming that the best they can do is negotiate with the prosecutor—taking a plea. You know, "hey, yeah, you guys got me—you got my client. Let's work something out." Um, and that's usually where people pay for a good attorney is they'll work out that plea agreement. Um, so. You know, this is not a complicated case, you know, uh, it's not O.J. Simpson where you've got the DNA here and all that other stuff. It's a very simple case. Um, so. But, the simplicity behind this case, there's another side of this story. Um, so. Uh, will it help you? Potentially. You telling us your side of the story. Um, I don't think it's gonna hurt you.

> Gallagher: Ok.

> Agent: Um, because, what I—you know, there's cases that are ongoing. So, in other words, um, I'm—I'm a drug dealer, so I have a, uh, a drug organization. You're arresting me for these cases here, but I still have shit going on. Um, and those are the individuals that have a complicated issue on their life. Uh, but we call this an historical case. It was done. It passed. And, you know, uh, I don't think there's anything more that you can incriminate yourself with than you already have. Can it help you? Potentially. Um, because there's a few questions that we're all, um, intrigued by.

(1:46-6:03, Tape 2).

Gallagher, at 6:31 of Tape 2, then states that he purchased two cars, at which point the Agent stops him by saying, "Ok. You wanna talk to us?" Gallagher, as above, indicates that he will "try a little bit." (6:37, Tape 2). The Agent prefaces the *Miranda* process/form as "administrative paperwork" (7:03, Tape 2), but does note to Gallagher beforehand that, "[s]o, you'll understand, you know, we have to do things, uh, to make sure that, um, we're doing the right thing, and you're doing the right thing, and you understand that what you're doing is the right thing. Um, once we start talking, at any time, you can stop if you feel uncomfortable. We're not going to

4

torture you—we're not Guantanamo."  (6:38-7:03, Tape 2) (ending with, "[u]m, so, uh, but we have to get past some administrative paperwork here").  Gallagher replies, "sure."  (7:05, Tape 2).

After a brief back-and-forth regarding Gallagher's alma mater, the University of Colorado at Boulder, he is apparently presented with a written sheet of paper listing out the *Miranda* warnings.  (7:43, Tape 2); *see also* [D.E. 26 at 4].  He questions, "[s]o, if I sign this, I'm waiving my rights to all of these things?"  (7:43-7:50, Tape 2).  The following colloquy ensues:

> Agent: Like I said, you don't have to talk to us if you don't want, so you already know that.  Um, anything you say can, uh, be used against you in court proceedings.  So, in other words, um, I've already told you how we got here with the evidence that we have, so we already have that evidence.  Um, I don't think you're going to add to it.  Um, you have a right to consult an attorney before making a statement or answering any questions.  Um, and you have a right to—for an attorney to be present.  We don't have an attorney in our pocket.  Um, and I'm sure you don't—you'd have to find one.  If you can't afford one, um, you know, one will be, you know, provided to you by the, uh, the government.

> Gallagher: Does it delay the process at all?

> Agent: What's that?

> Gallagher: If I decide I don't want to say anything and—?

> Agent: Does it delay the process?  No.  But it can help the process.  The more important process is where you're at a month from now.  You know what I'm saying?  Um, I don't think, like you know, you're not going to be unarrested today.   Um, but your charges potentially, um, that you bring something to light that can help you, um, and then what has occurred, um, can potentially move your case quicker in the sense that, hey, you know, the, um, the victim lied to us that being the dealership.  Um, you know, this shouldn't have never gotten, or, risen to that level.  So, um, that can potentially occur based on what you tell us.  Um, then again,

> if at any point you say, you know, this is just waiving your right
> for the—until you decide—

Gallagher: Not to waive it.

Agent: Exactly.

Gallagher: Cool.

Agent: Exactly.

(7:50-9:49, Tape 2).

It is then audible on Tape 2, at 9:57-9:59, that someone is signing a piece of paper. In context, it is evident that Gallagher is signing the written sheet of paper listing out the *Miranda* warnings. *See* [D.E. 26 at 4]; [D.E. 26-1].

Exhibit 1 to the Government's opposition to the motion to suppress is the signed waiver. [D.E. 26-1]. The Statement of Rights reads:

> Before we ask you any questions, it is my duty to advise you of your rights:
>
> You have the right to remain silent.
>
> Anything you say can be used against you in a court of law or other proceedings.
>
> You have the right to consult an attorney before making any statement or answering any questions.
>
> You have the right to have an attorney present with you during questioning.
>
> If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.
>
> If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.

*Id.*

## II.    ANALYSIS

### A.    *Legal Framework*

In *Miranda*, the Supreme Court established procedural safeguards that require law enforcement agents to advise criminal suspects of certain constitutional rights before they may initiate a custodial interrogation:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  Additionally, the suspect must be afforded the opportunity to exercise those rights throughout the interrogation.  *Id.* After the *Miranda* warnings are given, and the opportunity to exercise those rights is afforded, the suspect may voluntarily, knowingly, and intelligently waive those rights and make admissible statements to law enforcement agents.  *Id.*  In the absence of such warnings and waiver, however, evidence obtained as a result of the custodial interrogation will be inadmissible.  *Id.*

No precise formulation of the *Miranda* warnings is mandated.  *California v. Prysock*, 453 U.S. 355, 359 (1981) ("This Court has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant.").   To the contrary, "*Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures."  *Id.*  The prophylactic *Miranda* warnings are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is]

7

protected." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989).  Accordingly, a court considering this issue "need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.'" *Id.* (citing *Prysock*, 453 U.S. at 361); *see also United States v. Woods,* 684 F.3d 1045, 1055 (11th Cir. 2012) ("The *Miranda* warnings need not be perfect; rather, the warnings need only 'reasonably convey[]' the defendant's rights.").  Thus, so long as the warnings given to a suspect adequately meet the substantive requirements of *Miranda*, they are sufficient. *Duckworth*, 492 U.S. at 203.

When the Government seeks to admit a defendant's inculpatory statement at trial, it must prove by a preponderance of the evidence that the defendant voluntarily and knowingly waived his *Miranda* rights.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  Only if the totality of the circumstances of the interrogation reveals both "an uncoerced choice and the requisite level of comprehension" may a court properly conclude that *Miranda* rights have been waived.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  This requires the government to show that the *Miranda* warnings were given to the defendant, that the defendant understood his *Miranda* rights, and that the defendant then made an uncoerced statement. *Berghuis v. Thompkins*, 560 U.S. 370, 383–84 (2010).

The Court must make two distinct findings to conclude that a defendant's statement was made after a knowing and voluntary waiver of the *Miranda* rights. *Moran*, 475 U.S. at 421. First, the decision to relinquish the rights and make a

statement must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Second, the decision must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

The first inquiry under *Moran* is whether a defendant's statement was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. And the Supreme Court clarified in *Connelly* that the purpose of the Fifth Amendment privilege against self-incrimination is to protect individuals from official coercion, and therefore the "voluntariness" of a waiver of that privilege depends not on free choice in the abstract, but on the absence of police overreaching. *Connelly*, 479 U.S. at 169-70. For that reason, in *Connelly*, the Supreme Court found a suspect's waiver to be voluntary despite evidence that the suspect's confession was not the result of free choice but rather of a mental illness that compelled him to confess. *Id*. at 170-71. Thus, the Supreme Court emphasized that the Fifth Amendment privilege is not concerned with extraneous forces that compel a suspect to confess, such as mental illness, but only with pressure that emanates from official sources. *Id*.

The second inquiry under *Moran* asks whether the defendant waived his *Miranda* rights with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. Like the first inquiry, the "full awareness" requirement aims to distinguish between statements that are the product of a free choice and those that are compelled by

official coercion because the *Miranda* framework presumes that custodial interrogations are inherently coercive. *Id.* at 455-56 ("[T]he very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals."). To dispel this inherent pressure, the rights afforded by the Fifth Amendment must be explained to the suspect in an effective and express manner. *Id.* at 473.

Once a suspect understands the rights afforded to him, the *Miranda* framework presumes a subsequent waiver to be knowing.  For this reason, once understanding is established, it is the suspect's responsibility to clearly invoke any right he wishes to assert. *See Berghuis*, 560 U.S. at 381-82 (placing onus on suspect to invoke right to silence by holding that police may continue questioning until suspect unambiguously states he wants to remain silent); *see also Davis v. United States*, 512 U.S. 452 (1994) (holding that police have no duty to clarify equivocal requests for counsel and may continue questioning until suspect clearly requests counsel).  But, the prosecution must first show that the suspect understood his *Miranda* rights.  *Berghuis*, 560 U.S. at 383-84.  This is a threshold requirement, which is the bulwark against the inherently coercive nature of custodial interrogations.

To meet that burden, the Government must show here that Gallagher made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.  *See Moran*, 475 U.S. at 421.  To accomplish this, the Government must first show that Gallagher's decision to relinquish his rights and make a statement was "voluntary in the sense

that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. Then, second, the Government must show that Gallagher's decision was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id*.

### B. *Gallagher's Post-Miranda Statements Must be Suppressed*

Turning to the record here, no doubt, by the time Gallagher signs the *Miranda* form in Tape 2, he is aware he is only waiving his rights if and until he decides "not to waive [them]." (9:44-9:47, Tape 2). But whether Gallagher understands the actual rights he is waiving—and thus whether his waiver was voluntary, knowing, and intelligent—requires further analysis. To that end, and as Gallagher correctly asserts in his briefing, *United States v. Beale*, 921 F.2d 1412 (11th Cir. 1991), and *Hart v. Att'y Gen. of State of Fla.*, 323 F.3d 884 (11th Cir. 2003), are seminal cases in the Eleventh Circuit on whether alleged deception employed by law enforcement would render a defendant's statements involuntary. [D.E. 22 at 3-6]. As such, the Court will address each in turn.

In *Beale*, a defendant convicted on several counts related to armored truck robberies in the early-to-mid 1980s "claim[ed] on appeal that he did not sufficiently understand his constitutional rights to make a knowing and intelligent waiver of his *Miranda* rights and that he signed the waiver form only after the FBI agents told him that signing the form would not hurt him." 921 F.2d at 1419, 1421, 1434. While the defendant had only a fifth-grade education level and "did not speak English or read Spanish," as the Eleventh Circuit noted, "[a] lack of education and [an] inability

to speak English" do not preclude a defendant from "knowingly and intelligently waiving his *Miranda* rights." *Id.* at 1434-35 (collecting cases). Instead, *Beale* emphasized that the defendant's claim that "he signed the waiver only after the agent told him that signing the form would not hurt him" is what "distinguishe[d] this case." *Id.* at 1435. The court proceeded: "It appears that by telling [the defendant] that signing the waiver would not hurt him the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [the defendant] concerning the consequences of relinquishing his right to remain silent." *Id.* (citing *United States v. Dohm*, 618 F.2d 1169, 1175 (5th Cir. 1980), and *United States v. Womack*, 542 F.2d 1047 (9th Cir. 1976)). The court subsequently found, considering the totality of the circumstances, that the defendant's statements were wrongly admitted in violation of *Miranda*. *Id.*

Numerous cases have since relied on and interpreted *Beale*, including later Eleventh Circuit cases. *See, e.g., Hart,* 323 F.3d at 894; *United Sates v. Castor*, 598 F. App'x 700, 703-04 (11th Cir. 2015) (involuntary waiver where defendant was given assurances that no other drug charges would be brought against him, even where defendant was given *Miranda* warnings twice and indicated he was willing to cooperate); *United States v. Lall*, 607 F.3d 1277, 1283-84 (11th Cir. 2010) (post-*Miranda* waiver deemed involuntary where defendant (i) was told no charges would be pursued against him and (ii) was isolated and told questioning "was to protect [his] family from future harm").[3]

---

[3] *C.f. United States v. Flores*, No. 23-cr-20472, 2024 WL 3761708, at *10 (S.D. Fla. May 30, 2024), *report and recommendation adopted*, No. 23-CR-20472, 2024 WL

In one such case, *Hart*, a detective contradicted a *Miranda* warning by telling the defendant that having a lawyer present would be a "disadvantage" and that "honesty wouldn't hurt him."  323 F.3d at 894-95.  The detective did have a prior relationship with the defendant, which generated "trust[]," but *Hart* focused on the specific statements the detective made when asked about the "pros and cons" of having an attorney present in finding the defendant's statements were made involuntarily.  *Id.*  Of import here:

> Schuster[, the detective,] testified that when she arrived Hart[, the defendant,] asked her whether he should get a lawyer, and she told him that she could not answer that. . . . When she returned, Hart asked her what were the pros and cons, in her opinion, of hiring a lawyer. Although asking for the pros and cons of hiring a lawyer is not an unequivocal request for counsel, it does indicate that Hart did not fully understand his right to counsel and was asking for clarification of that right.  Schuster responded to Hart's request for clarification by telling him that in her opinion the pros of having an attorney were "He'll protect your rights.  He'll tell you what to answer, what not to answer, and he'll be here for you."  This was an acceptable response, but then she also told him that the con in her opinion was "I'm going to want to ask you questions and he's going to tell you you can't answer me."  Hart asked Schuster for a clarification of his right to counsel, and Schuster responded by telling him that the disadvantage of having a lawyer present was that the lawyer would tell Hart not to answer incriminating questions. . . . During this colloquy on the pros and cons of hiring a lawyer, Schuster also told Hart that "honesty wouldn't hurt him."

3760946 (S.D. Fla. Aug. 12, 2024) (voluntary waiver where post-*Miranda* statement that defendant had "nothing to worry about" was not deceptive and did not affect the defendant's decision on waiver); *United States v. Cosimano*, No. 19-14841, 2022 WL 3642170 (11th Cir. Aug. 24, 2022) (voluntary waiver where an agent made post-*Miranda* statements that honesty could "help" the defendant, but no promises were made to the defendant); *United States v. Corrales*, No. 03-20155-CR, 2003 WL 27387499, at *6 (S.D. Fla. June 9, 2003), *report and recommendation adopted*, No. 03-20155-CR, 2003 WL 27387500 (S.D. Fla. Aug. 19, 2003), *aff'd*, 184 F. App'x 843 (11th Cir. 2006) (voluntary waiver where "detectives did not advise CORRALES or imply that waiving his rights would not hurt him, or that telling the truth would not hurt him").

*Id.*  The Eleventh Circuit thus found "no significant difference" between the facts of *Hart* and *Beale*, where the detective's "statement that honesty would not hurt Hart had the same misleading effect as the FBI agents' statement that signing the waiver form would not hurt the suspect in *Beale.*"  *Id.* at 895.  "Telling him that 'honesty wouldn't hurt him' contradicted the *Miranda* warning that anything he said could be used against him in court.  The phrase 'honesty will not hurt you' is simply not compatible with the phrase 'anything you say can be used against you in court.'"  *Id.* at 894.  Under a totality of the circumstances analysis, *Hart* concluded that the defendant's decision to waive his rights was the product of the detective's deception, and thus not voluntary, knowing, and intelligent.  *Id.* at 895; *see also Moran* 475 U.S. at 421.

Tasked with applying these precedents here, we readily conclude that the facts of Gallagher's custodial interrogation are inescapably in line with *Beale*, *Hart*, and their progeny.

*First*, Gallagher, when asking the Agent for a clarification of his rights, is told that the Agent "do[esn't] think it's gonna hurt [him]."  *See* (1:46-5:13, Tape 2).  Moreover, as the custodial interrogation is ramping up, just one minute and fifty-two seconds into the second tape, Gallagher states that he could tell the Agents his side of the story, but asks whether he should, because he has "never been in this position."[4] While Gallagher does not make express reference to an attorney, it is clear the Agent

---

[4] At this point, the Agent to whom Gallagher directs the question and who leads the interrogation up to the signing of the *Miranda* form has already indicated at least twice that he is experienced at his job.  *See* (3:10, 6:28, Tape 1).

interprets his statement this way, as he—in the process of a lengthy response—begins discussing "how[] attorneys work." (3:48, Tape 2). This is reminiscent of *Hart*, where the defendant asked the detective for the "pros and cons" of having an attorney present, which the court found "does indicate that [the defendant] did not fully understand his right to counsel and was asking for clarification of that right." 323 F.3d at 894.

Then, as in *Hart*—and as in *Beale*—the Agent does exactly what these cases caution against: he tells Gallagher pre-*Miranda* that, as to him telling the Agents his side of the story, the Agent "do[esn't] think it's gonna hurt [him]." (5:13, Tape 2); *Beale*, 921 F.2d at 1435; *Hart*, 323 F.3d at 894. It follows, as in *Hart*, that a pre-*Miranda* statement from this Agent to Gallagher that telling his story will not "hurt" him is similarly "simply not compatible with the phrase 'anything you say can be used against you in court.'" 323 F.3d at 894. That interaction alone clearly runs afoul of Eleventh Circuit precedent and, at minimum, strongly suggests that Gallagher's waiver was not voluntary, knowing, or intelligent. But because this is a totality of the circumstances analysis, the Court must probe further. *See Mincey v. Arizona*, 437 U.S. 385, 401-02 (1978) ("Determination of whether a statement is involuntary requires more than a mere color-matching of cases. It requires careful evaluation of all the circumstances of the interrogation.") (internal citation omitted).

*Second*, several of the Agent's other statements to Gallagher also conflict with the given *Miranda* warnings. As noted above, in answering Gallagher's question on whether he "should" tell his story, the Agent states the following:

15

**Um, so, uh, how do attorneys work?  Um, you'll bond out.  You'll look for an attorney.**  Uh, hopefully, a good criminal attorney.  Um, that criminal attorney, uh, depending whether or not they have a relationship with the U.S. Attorney's office, um, will look at the evidence we have, and, at the end of the day, this is what I tell people: you could spend a lot of money on an attorney, um— but—they're—sometimes, the evidence is so overwhelming that the best they can do is negotiate with the prosecutor—taking a plea.  You know, "hey, yeah, you guys got me— you got my client.  Let's work something out."  **Um, and that's usually where people pay for a good attorney is they'll work out that plea agreement.**

(3:47-4:43, Tape 2) (emphasis added).  And, again, consistent with *Hart*, Gallagher has at this point, pre-*Miranda*, indicated that he does not fully understand his right to counsel and has asked this Agent for clarification.  *See supra*; *Hart*, 323 F.3d at 894.  Then, several minutes later after Gallagher is presented with written *Miranda* warnings and asks if signing this means he will waive all the listed rights, the Agent responds with the following:

Um, **anything you say can, uh, be used against you in court proceedings**.  So, in other words, um, I've already told you how we got here with the evidence that we have, so we already have that evidence.  Um, I don't think you're going to add to it.  Um, **you have a right to consult an attorney before making a statement or answering any questions**.  Um, and **you have a right to—for an attorney to be present**.  We don't have an attorney in our pocket.  Um, and I'm sure you don't—you'd have to find one.  If you can't afford one, um, you know, one will be, you know, provided to you by the, uh, the government.

(7:58-8:35, Tape 2) (emphasis added).

So one can readily see that the Agent, pre-*Miranda* and in response to Gallagher asking for advice on how to proceed, represents to Gallagher that attorneys come into the picture after he "bond[s] out"—only then will he "look for an attorney." And, what's more, "usually where people pay for a good attorney" is at the plea agreement phase.  These representations are in direct contravention of the Agent's

16

later *Miranda* advisement—that Gallagher *currently* has these constitutional rights.[5] As with the contradiction in *Hart* between the statement that honesty could not hurt the defendant and the legal reality that anything he said could be used against him, the representation that Gallagher would "look for an attorney" after "bond[ing] out" is incompatible with the statement that "you have a right to consult an attorney before making a statement or answering any questions." *See* 323 F.3d at 894. *Compare* (3:47-4:43, Tape 2) *with* (7:58-8:35, Tape 2).

When Gallagher, directly following this, asks whether a decision to not talk to the Agents would "delay the process at all," the Agent gives a succinct "no," before stating that Gallagher talking to the Agents could "help the process," because "[t]he more important process is where [he is] at a month from now." (8:36-8:51, Tape 2). This, too, directly contradicts the statements provided to Gallagher on his written *Miranda* form—including that, "[i]f [he] decide[s] to answer questions now, [he] still [has] the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney." [D.E. 26-1]. "If the accused indicates that he wishes to remain silent, 'the interrogation must cease.' If he requests counsel, 'the interrogation must cease until an attorney is present.'" *Edwards v. Arizona*, 451 U.S.

---

[5] The Agent also appears to insinuate in his earlier statement that only attorneys that "have a relationship with the U.S. Attorney's office" will be able to look at the evidence from the investigation. (3:58-4:06, Tape 2) ("Um, that criminal attorney, uh, depending whether or not they have a relationship with the U.S. Attorney's office, um, will look at the evidence we have . . . ."). While this statement, in and of itself, does not necessarily contradict an element of the *Miranda* warnings given to Gallagher, it is misleading. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

477, 482 (1981) (citing *Miranda*, 384 U.S. at 474); *see Miranda*, 384 U.S. at 474 ("Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked."). In other words, were Gallagher to have invoked either his right to remain silent or his right to an attorney, the "process" would, in fact, be "delay[ed]"—even if only temporarily.

Such contradictions matter—particularly in the case of a defendant who is seeking clarification of his rights. *See* (1:46, Tape 2); *Hart*, 323 F.3d at 894. By the point in time at which Gallagher is presented with the written *Miranda* waiver and given *Miranda* warnings by the Agent (and even during that process), it is by no means clear under the circumstances that Gallagher could conclude where and when his rights took hold—let alone have sufficient understanding of those rights such that he could voluntarily, knowingly, and intelligently waive them.

We therefore conclude based on the totality of the circumstances that Gallagher's waiver was "the product . . . of deception" and not "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *See Moran*, 475 U.S. at 421. Thus, the Government cannot meet its burden to show that Gallagher's *Miranda* waiver was voluntary. The audio recording and any written transcript of Gallagher's custodial interrogation must be suppressed.

### C. *The Government's Justifications are not Persuasive*

The Government responds to this well-established line of authority enforcing *Miranda* in our Circuit by first claiming that no material failure took place in the Agents giving the required warning before the first interview.  That is the case, says the Government, because when read together the three challenged components of the warning all show that Gallagher was effectively told that his statements could be used against him.  So, rather than a promise of immunity or leniency, the Agents' chosen verbiage accurately advised that his answers could be used against him even though the Agent opined that it would not likely make a difference.

And even if there was a failure in the original warning, the written form handed to Gallagher clarified for him, to the extent he harbored any doubts based on the Agents' opinion, that his statements could be used against him.  This is different from the cases cited above where the agents or officers directly contradicted the warnings by flat-out telling him that they would not be used against him.

The Government relies primarily on a non-precedential *per curiam* decision that distinguished *Beale* and *Hart*, *United States v. Cosimano,* 2022 WL 3642170. There, the panel decision affirmed the denial of a motion to suppress that was founded on the argument that the agent downplayed the *Miranda* warnings by saying that honesty could "help" him and put him "in the best possible position." But the agent made no promises and added that "I'm not making you any promises, okay? I literally, I cannot do it." *Id.* at *8-9.  The Court distinguished this type of inducement to the suspect, by suggesting that his cooperation might help him in the long run,

from the direct "contradiction" present in *Beale* and *Hart* where officers told the suspect that their cooperation would not hurt them. *Id.* at *9.

Indeed, the Government could cite a plethora of cases where inducements from agents or officers, in the form of statements like cooperation could help a suspect in some form or fashion, or that the agents or officers could take more kindly to the suspect if he was open and honest with them, have not been found to be sufficient to undermine an otherwise properly administered *Miranda* warning. That is the case because discussions about the possibility of cooperating and how it could be of help to a defendant does not make a defendant's statements per se involuntary. Such inducements are often true and, as long as firm promises are not made, they do not overcome the voluntariness of a statement following a full *Miranda* warning. *See, e.g., United States v. Graham,* 323 F. App'x 793, 801 (11th Cir. Apr. 20, 2009) (statements made after *Miranda* not involuntary where no express promise of leniency was made and officer "merely confirmed what Graham already understood, namely, that he might be able to benefit in the future if he cooperated.") (citing with approval *United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir. 1995) (holding that "there is no inconsistency between the required warning that a defendant's statement may be used against him and a further statement that cooperation can help him. Both are true.")); *United States v. Mercer,* 541 F.3d 1070, 1075-76 (11th Cir. 2008) (concluding that the defendant's statements would be voluntary "[e]ven if the . .. agent approached [the] Defendant about the possibility of a cooperation agreement") (citing *United States v. Davidson,* 768 F.2d 1266, 1271 (11th Cir. 1985) (law enforcement

assurance that "the accused's cooperation would be passed on to judicial authorities and would probably be helpful to him is not a sufficient inducement so as to render a subsequent incriminating statement involuntary")); *United States v. Nash,* 910 F.2d 749, 752 (11th Cir. 1990) (telling defendant "that cooperating defendants generally 'fared better time-wise' " did not amount to illegal inducement).

That type of tacit inducement is very different, however, from what the Eleventh Circuit has already dealt with here; namely, statements from an agent or officer that undermine the *Miranda* warning that his/her statement very well could hurt or prejudice the defendant.  That is the core prescription that *Miranda* requires to invoke a voluntary statement because the suspect would have to understand that, if he decides not to remain silent, the government could then turn around and bolster its case against him.  As the Eleventh Circuit explained in detail in *Hart,*

> During this colloquy on the pros and cons of hiring a lawyer, Schuster also told Hart that "honesty wouldn't hurt him." Telling him that "honesty wouldn't hurt him" contradicted the *Miranda* warning that anything he said could be used against him in court.  The phrase "honesty will not hurt you" is simply not compatible with the phrase "anything you say can be used against you in court." The former suggested to Hart that an incriminating statement would not have detrimental consequences while the latter suggested (correctly) that an incriminating statement would be presented at his trial as evidence of his guilt.

*Hart,* 323 F.3d at 894.

The Government's position would have us change the law in this material respect.  In its view, a tie goes to the Government absent a compelling showing by the defendant of exceptional circumstances (like mental incapacitation, lack of education, etc.) that compel otherwise.  As an example, the Government argues that a case

21

involving an illiterate, mentally challenged defendant, like the one in *Beale,* was the difference-maker in that case that warranted suppression of the suspect's statement. Here, by contrast, we have an ostensibly well-educated and well-healed defendant, who was sophisticated enough to engage in the type of financial transactions at issue in this indictment, who would obviously understand and resolve on his own any ambiguity in the Agent's warning.  In other words, even though he was told his statements would not hurt him (because he was already in a great deal of trouble), once he was also told seconds later that his statements could be used against him then he was on notice that what the Agent originally said was potentially wrong and should not be relied on.

That type of sophisticated legal analysis is an anathema in a post *Miranda* world.  The whole purpose of the Court-mandated warning, designed to protect Fifth Amendment values, is to avoid anyone, well-educated or not, from failing to understand the significance of what he is being asked to do.  And the Eleventh Circuit requires that such warning not be administered with any ambiguous, contradictory language that undermines the validity of what the suspect was just told.  That basic, easily understood premise is what *Beale* and *Hart* are enforcing.

And even if we agreed with the Government that those decisions should not be read so literally, or that they were designed for a defendant who sits in a very different footing from this one (which we do not), the holdings in those decisions are binding on us.  If the Eleventh Circuit chooses to recede from them at a later point, that is a decision for that Court to make.  When a holding of an Eleventh Circuit

decision squarely applies, as it does here given the similarity between the *Miranda* failings identified in *Beale* and *Hart* and those cited here, we are duty bound to apply them. *See, e.g., United States v. Powell*, 844 F. App'x 280, 282 (11th Cir. 2021) ("Like the district court, we are bound by our prior holdings on the same issue until the Supreme Court or the *en banc* court hold otherwise."); *United States v. Gandy*, 710 F.3d 1234, 1238 (11th Cir. 2013) (affirming district court ruling even though "the district court recognized that the Supreme Court's decision in *Sykes v. United States,* —— U.S. ——, 131 S. Ct. 2267, 180 L.Ed.2d 60 (2011), significantly called our holding in *Harrison* into question, but the district court was 'of the opinion that it is still bound by the *Harrison* decision until such time as the 11th Circuit recedes from it or the Supreme Court expressly overrules *Harrison*.'"); *United States v. Steele,* 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc) ("The law of this circuit is emphatic that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision.").

In sum, the Government's efforts to save these incriminating statements from being used for anything other than impeachment are not persuasive. What happened here rarely happens; usually agents or officers are not so confident in their cases that they boldly tell a suspect that anything they say will likely not be used against them. But for whatever reason here these Agents took a different approach, which resulted in them directly contradicting in one breath the *Miranda* waiver that they dutifully read in the other. The Eleventh Circuit has spoken to this situation loudly and

clearly.  And having gotten the message, we recommend that these statements be suppressed.

### III.   CONCLUSION

Based on the foregoing, we **RECOMMEND** that Defendant Roger Albert Taft Gallagher's motion to suppress [D.E. 22] be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days to serve and file written objections, if any, with the Honorable Donald M. Middlebrooks, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C v Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 30th day of October 2024.

EDWIN G. TORRES
United States Magistrate Judge